**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellee*,

v.

DENYS KOROTKIY,

*Defendant - Appellant*.

No. 23-2443

D.C. No.
3:22-cr-02762-
TWR-1

OPINION

Appeal from the United States District Court
for the Southern District of California
Todd W. Robinson, District Judge, Presiding

Argued and Submitted May 16, 2024
Pasadena, California

Filed October 10, 2024

Before: N. Randy Smith and Salvador Mendoza, Jr., Circuit
Judges, and John Charles Hinderaker, District Judge.[*]

Opinion by Judge Mendoza;
Dissent by Judge N. Randy Smith

---

[*] The Honorable John Charles Hinderaker, United States District Judge
for the District of Arizona, sitting by designation.

**SUMMARY**[**]

**Criminal Law**

The panel affirmed the district court's order denying Denys Korotkiy's motion to dismiss a count charging him under 33 U.S.C. § 1908 with violating 33 C.F.R. § 151.25 (2023), a regulation that requires shipmasters to, among other things, maintain a record of certain bilge-water operations while in U.S. waters.

Under international and federal law, it is unlawful to dump the polluted water that collects in a boat's bottom—otherwise known as "oily bilge water"—while at sea. The same laws require ships to log their bilge-water operations in an Oil Record Book. Korotkiy, the Chief Engineer of a foreign-flagged ship, along with the crew, flouted those laws by dumping oily bilge water on the high seas and covering it up with misleading entries in the ship's Oil Record Book.

Korotkiy argued (1) § 151.25 does not require crewmembers to maintain substantively "accurate" records in Oil Record Books; (2) neither Congress nor the international community intended for such prosecutions to occur; and (3) only ship masters, and not chief engineers, should be charged for violations of § 151.25.

Joining four other circuits, the panel held that § 151.25's plain language proscribes Korotkiy's conduct. The regulation imposes a duty upon a foreign-flagged vessel to ensure that the record in its Oil Record Book is accurate (or

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

at least not knowingly inaccurate) upon entering the United States' territorial waters. Korotkiy's reading of "maintain" as entailing exclusively "preservation" is inconsistent with § 151.25's other provisions; the panel's interpretation of the "maintenance" requirement is consistent with the term's place in the overall statutory scheme and with the legislative purpose of the Act to Prevent Pollution from Ships (APPS), pursuant to which Congress delegated to the United States Coast Guard the authority to prescribe regulations to carry out the provisions of the 1973 International Convention for the Prevention of Pollution from Ships and the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships (collectively, MARPOL).

The panel rejected Korotkiy's alternative argument that because he is not a "shipmaster" he is not bound by § 151.25's maintenance requirement. Courts uniformly agree that chief engineers can be prosecuted, as Korotkiy was, for aiding and abetting the failure to maintain an accurate record book.

Judge N.R. Smith dissented. He wrote that ordinary meaning, usage in related provisions, the language of MARPOL, and the MARPOL-focused purpose of APPS all support interpreting "maintain" in the sense of "preserve"; and that whatever other wrongs Korotkiy committed, he did not fail to maintain the ship's Oil Record Book or cause such failure while in U.S. waters.

**COUNSEL**

Allen M. Brabender (argued) and Stephen Da Ponte, Attorneys, Environment & Natural Resources Division, Appellate Section; Todd Kim, Assistant Attorney General; United States Department of Justice, Washington D.C.; Melanie K. Pierson and Daniel E. Zipp, Assistant United States Attorneys; United States Department of Justice, Office of the United States Attorney, San Diego, California; for Plaintiff-Appellee.

Edward S. MacColl (argued) and Marshall J. Tinkle, Thompson Bull Furey Bass & MacColl LLC, Portland, Maine, for Defendant-Appellant.

**OPINION**

MENDOZA, Circuit Judge:

Under international and federal law, it is unlawful to dump the polluted water that collects in a boat's bottom—otherwise known as "oily bilge water"—while at sea. Those same laws also require ships to log their bilge-water operations in an Oil Record Book. Defendant and Chief Engineer Denys Korotkiy, along with the crew aboard the foreign-flagged ship MV *Donald*, flouted those laws by dumping oily bilge water on the high seas and covering it up with misleading entries in the ship's Oil Record Book. After making port in the United States and presenting the Oil Record Book to U.S. officials, Korotkiy faced prosecution under federal law, including 33 C.F.R. § 151.25 (2023). That regulation requires shipmasters to, among other things, "maintain" a record of certain bilge-water operations in an

Oil Record Book while in U.S. waters. And the MV *Donald*'s record was—to put it simply—inaccurate. Korotkiy moved to dismiss his indictment, arguing that "maintain" does not mean "maintain accurately" and that § 151.25 neither applied to him nor proscribed his conduct.

The district court was unpersuaded. It applied out-of-circuit case law to find that Korotkiy could be charged for causing the failure to maintain an accurate record of bilge-water operations in an Oil Record Book at port under § 151.25. On appeal, Korotkiy urges us to reverse the district court's order because: (1) § 151.25 does not require crewmembers to maintain substantively "accurate" records in Oil Record Books; (2) neither Congress nor the international community intended for such prosecutions to occur; and (3) only ship masters, and not chief engineers, should be charged for violations of § 151.25. Although this is a matter of first impression in the Ninth Circuit, we join the First, Second, Third, and Fifth Circuits. We hold that the regulation's plain language proscribes Korotkiy's conduct and affirm the district court's decision.

## I.

### A.

On May 14, 2022, the MV *Donald*—a cargo ship registered in Liberia—left South Korea for San Diego. Like many cargo ships, the MV *Donald* collects bilge water in its bottom. *see* 33 C.F.R. § 151.05. Bilge-water accumulation presents unique challenges. Captain Jack Sparrow's boat, for example, sank after collecting too much water in its

bilge.[1]  Thankfully, modern ships like the MV *Donald* are better equipped than Captain Jack's, and they periodically dump bilge water to prevent on-board machinery and engine rooms from becoming submerged.  Still, bilge water often mixes with oil runoff and, when dumped at sea, can cause oceanic pollution.  In the 1960s and 70s, a spate of deadly tanker accidents and oil spills brought the dangers of such pollution into sharp relief, spurring international efforts "to achieve the complete elimination of intentional pollution of the marine environment by oil and other harmful substances."[2]

To help stem the flow of oily bilge water, the United Nations' Inter-Governmental Maritime Consultative Organization, now known as the IMO, penned the 1973 International Convention for the Prevention of Pollution from Ships[3] and the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships[4] (together, "MARPOL").  The United States ratified MARPOL through the Act to Prevent Pollution from Ships ("APPS").  *See* Pub. L. No. 96-478, 94 Stat. 2297 (1980), *codified as amended at* 33 U.S.C. §§ 1901–15

---

[1] Pirates of the Caribbean: The Curse of the Black Pearl (Walt Disney Pictures 2003).  Fortunately, that bilge-water accumulation only imperiled his rowboat and not the *Black Pearl*.  *Id.*

[2] International Convention for the Prevention of Pollution from Ships, Nov. 2, 1973, 1340 U.N.T.S. 184; *see also* Necmettin Akten, *Shipping Accidents: A Serious Threat for Marine Environment*, 12 J. Black Sea/Mediterranean Env't 269, 282–83 (2006).

[3] *See* 1340 U.N.T.S. 184.

[4] *See* Feb. 17, 1978, 1340 U.N.T.S. 61; *see also* Convention on the Intergovernmental Maritime Consultative Organization, Mar. 17, 1958, 9 U.S.T. 621, 289 U.N.T.S. 48.

(2018). Under APPS, Congress made it a felony to knowingly violate MARPOL. 33 U.S.C. §§ 1907, 1908(a). And Congress delegated authority to "administer and enforce" MARPOL to the U.S. Coast Guard, 33 U.S.C. § 1903(a), (c)(4), broadly authorizing it to "prescribe any necessary or desired regulations to carry out the provisions of the MARPOL Protocol, Annex IV to the Antarctic Protocol, or this chapter," *id.* § 1903(c)(1).

Relevant here, MARPOL requires a ship like the MV *Donald* either to (1) filter its oily bilge water before returning it to the sea or (2) sequester that water and discharge it at a designated reception facility once the ship arrives at port. MARPOL Annex I, Regs. 15, 16; *see also* 33 C.F.R. § 151.10(a)–(b). MARPOL also requires a ship to record its bilge-water "operations" in an "Oil Record Book." MARPOL Annex I, Reg. 17; 33 C.F.R. § 151.25. MARPOL specifies that documentation of discharges "shall be fully recorded without delay in the Oil Record Book Part I, so that all entries in the book appropriate to that operation are completed." Annex I, Reg. 17.4. Additionally, the Book must be kept "in such a place as to be readily available for inspection" and "shall be preserved for a period of three years after the last entry has been made." *Id.* at 17.6; *see also* MARPOL Annex I, Appendix III.

In implementing MARPOL under the APPS, the Coast Guard thus requires ships like the MV *Donald* to "maintain an Oil Record Book," and, importantly here, it specifies that the "master or other person having charge of a ship required to keep an Oil Record Book shall be responsible for the maintenance of such record." 33 C.F.R. § 151.25(a), (j). The Oil Record Book, therefore, contains a "running log" of bilge-water activities, with entries for "tank-to-tank" oil transfers, "discharge[s] of oily bilge water," "failure[s] of

filtering equipment," and "any accidental or emergency discharge[s] of oily waste exceeding the legal limit." *United States v. Vastardis*, 19 F.4th 573, 578 (3d Cir. 2021) (citing MARPOL Annex I, Reg. 17; 33 C.F.R. § 151.25).

Under MARPOL, APPS, and APPS's implementing regulations, both a "port state[]" (the country where a ship arrives) and a "flag state" (the country where a ship is registered) can police violations of the Convention. *See United States v. Abrogar*, 459 F.3d 430, 432 (3d Cir. 2006); MARPOL art. 6(2), 1340 U.N.T.S. at 187. The flag state—in this case, Liberia—has the most authority under MARPOL. Flag states may prosecute MARPOL violations "wherever the violation occurs." MARPOL art. 4(1), (2), 1340 U.N.T.S. at 185–86. But the port state—here, the United States—may only prosecute MARPOL violations that occur within its ports or territorial waters. 33 C.F.R. § 151.09(a)(5). MARPOL also obligates a port state to refer evidence of MARPOL violations committed outside its territorial waters to a ship's flag state, so that the flag state can take "appropriate action" against the ship and its crew for any high-seas misconduct. MARPOL art. 6(2), 1340 U.N.T.S. at 187.

## B.

After the MV *Donald* left South Korea, Chief Engineer Korotkiy ordered its crew to dump the ship's bilge water directly into the ocean, bypassing the ship's pollution-abatement equipment and storage tanks. Shortly thereafter, one of the MV *Donald*'s crewmembers reported this conduct via email to the U.S. Coast Guard while at sea and let the MV *Donald*'s captain know that he had sent the tip-off email. That tip-off prompted Korotkiy and the captain to try and hide the bilge-water dumping.

When the MV *Donald* arrived at the Port of San Diego on May 31, 2022, the U.S. Coast Guard boarded the ship, interviewed various crewmembers, and inspected its machinery and Oil Record Book. The Coast Guard determined that the MV *Donald*'s Oil Record Book contained an inaccurate and incomplete record of the ship's bilge-water operations. The Book, for example, contained no entries for oily-bilge-water transfers between March 22 and May 24, 2022. That was unusual. Between October 2019 and February 2022, the MV *Donald*'s Oil Record Book recorded transfers of approximately 5.8 gallons per day. And the MV *Donald* would have needed to transfer oily bilge water between March and May 2022. Indeed, the ship's alarm records showed that bilge-water accumulation was dangerously high during that period, and transfers would have been necessary to prevent the ship's machinery from becoming submerged. Separately, Korotkiy recorded two transfers of oily bilge water in the Oil Record Book on May 25 and 28, 2022, despite no alarm records indicating that a transfer was necessary on those days. According to the Coast Guard, those entries were false and likely prompted by the tip-off email.

## C.

So the Coast Guard detained the vessel and its crew, and the United States brought charges against Korotkiy on four counts. Relevant here, count 2 charged Korotkiy with the following:

> On or about May 31, 2022, in the port of San Diego, and within the Southern District of California and elsewhere, defendant DENYS KOROTKIY did knowingly fail and cause the failure to maintain an Oil Record Book

for the MV Donald.  Specifically, defendant KOROTKIY maintained and caused to be maintained an Oil Record Book that: (1) failed to record the transfers of machinery space bilge water . . . (2) failed to record that discharges of machinery space bilge water had been made . . . ; and (3) falsely recorded the volume of machinery space bilge water . . . in violation of Title 33, United States Code, Section 1908(a); Title 18, United States Code, Section 2(b); Title 33, Code of Federal Regulations, Section 151.25; and MARPOL Annex I, Regulation 17.

Before trial, Korotkiy moved to dismiss the indictment, including count 2.  He claimed that any unlawful activity—specifically, bilge-water dumping and false recordkeeping—took place outside of the United States' territorial waters and, thus, § 151.25 did not proscribe his conduct.  Ruling from the bench, the district court denied his motion.  Relying on *United States v. Jho*, 534 F.3d 398 (5th Cir. 2008), *United States v. Ionia Management S.A.*, 555 F.3d 303 (2d Cir. 2009) (per curiam), and *United States v. Vastardis*, 19 F.4th 573 (3d Cir. 2021), the district court held that Korotkiy could be charged for knowingly failing to maintain an accurate Oil Record Book while in U.S. waters.  After a five-day trial, a jury convicted Korotkiy on three counts, including count 2.  Korotkiy timely appeals the district court's order denying his motion to dismiss count 2.

## II.

We have jurisdiction under 28 U.S.C. § 1291.  Korotkiy does not challenge the sufficiency of the evidence for his conviction.  Instead, he challenges the propriety of being

charged under 33 U.S.C. §1908(a), 33 C.F.R. § 151.25, 18 U.S.C. § 2(b), and MARPOL Annex I, Reg. 17 for knowingly failing and causing the failure to maintain the MV *Donald*'s Oil Record Book. Thus, we review de novo the district court's order denying Korotkiy's motion to dismiss count 2 of the indictment. *United States v. Marcucci*, 299 F.3d 1156, 1158 (9th Cir. 2002).

## III.

Korotkiy's appeal turns on what it means to be "responsible for the maintenance of [the] record" in an Oil Record Book under 33 C.F.R. § 151.25(j). Korotkiy argues that the regulation's "maintenance" requirement imposes a duty on shipmasters to "preserve" or "keep" an Oil Record Book in good condition and on board the ship. It does not, however, impose any additional obligation on foreign engineers of foreign-flagged vessels to maintain a substantively "accurate" record in an Oil Record Book while in U.S. territorial waters. According to Korotkiy, an interpretation of "maintenance" that requires accuracy undermines both MARPOL and APPS because it permits the federal government to prosecute misconduct committed on the high seas and outside of the United States' jurisdiction.

The government disagrees. Conceding that this is a matter of first impression in the Ninth Circuit, it asks us to adopt the Fifth, Second, Third, and First Circuits' reasoning in *Jho*, *Ionia*, *Vastardis*, and *Hornof v. United States*, 107 F.4th 46 (1st Cir. 2024), respectively. All four courts have considered appeals substantially resembling Korotkiy's,[5]

---

[5] Indeed, the *Vastardis* and *Hornof* cases, which raise identical issues and arguments to Korotkiy's appeal, were litigated in the Third and First Circuits by Korotkiy's counsel.

and each has held that APPS and the Coast Guard's regulations permit the criminal prosecution of individuals that knowingly maintain inaccurate Oil Record Books while in U.S. waters. After considering those circuits' decisions, § 151.25's plain language, the statutory framework, and MARPOL's and APPS's purpose, we agree with our sister circuits: § 151.25 imposes a duty upon a foreign-flagged vessel to ensure that the record in its Oil Record Book is accurate (or at least not knowingly inaccurate) upon entering the United States' territorial waters. We therefore join the *Jho*, *Ionia*, *Vastardis*, and *Hornof* courts and affirm the district court's decision.

## A.

We have yet to construe § 151.25's "maintenance" requirements for Oil Record Books. Thankfully, we do not sail in uncharted waters. In *Jho*, the Fifth Circuit considered an appeal largely identical to Korotkiy's. *See* 534 F.3d at 400. There, a shipping company and the chief engineer of one of its foreign-flagged ships sought to dismiss an indictment charging them with failing to maintain an accurate Oil Record Book while in U.S. territorial waters under § 151.25. *Id.* at 400–01. Like Korotkiy, the *Jho* defendants argued that any alleged misconduct took place on the high seas, where the unlawful bilge-water dumping occurred and the inaccurate Oil Record Book entries had been recorded. *Id.* at 401–03. The *Jho* defendants asserted that § 151.25's "maintenance" requirement merely entailed a duty to "make the requisite entries" in the book, and not that those entries be substantively accurate. *Id.* at 403.

The Fifth Circuit disagreed. It held that § 151.25's maintenance requirement "impose[s] a duty upon a foreign-flagged vessel to ensure that its oil record book is accurate

(or at least not knowingly inaccurate) upon entering the ports of navigable waters of the United States." *Id.* The *Jho* court identified two bases for its decision. First, it reasoned that "[a]ccurate oil record books are necessary to carry out the goals of MARPOL and the APPS." *Id.* After all, if § 151.25 merely required that records be preserved or kept on board, the "Coast Guard's ability to conduct investigations against foreign-flagged vessels would be severely hindered" and "polluters (and likely future polluters) [could] avoid detection." *Id.* Second, the court reasoned that such prosecution was consistent with international law. *Id.* at 405–06. Although flag states generally prosecute crimes committed by their own ships under international law, "it has long been established that a state has the power to prosecute violations of its laws committed by foreign-flagged vessels in its ports." *Id.* at 408–09. "Far from signaling an abdication of this traditional authority, the APPS indicates Congressional willingness to criminalize knowing violations of MARPOL, the APPS, and APPS regulations committed by foreign-flagged ships while in United States' ports and navigable waters." *Id.* at 409–10. Thus, the *Jho* court concluded that the government was well within the law to charge the defendants with causing the failure to maintain an accurate Oil Record Book in U.S. waters.

The Second Circuit followed in *Jho*'s wake a year later in *Ionia*. 555 F.3d at 306. It too construed § 151.25 as "impos[ing] a duty on ships, upon entering the ports or navigable waters of the United States, to ensure that [their] [Oil Record Book] is accurate (or at least not knowingly inaccurate)." *Id.* Just like *Jho*, the *Ionia* court dealt with chief and second engineers who discharged "oily waste water into the high seas" and "made false entries in the [Oil Record Book] to conceal such discharges." *Id.* at 305. Like

here, the *Ionia* defendants asserted that they had not violated the Coast Guard's regulations because the "crew only *possessed* the falsified [Oil Record Book] and did not *make* any false entries when [the ship] was in U.S. waters." *Id.* at 306.

Unpersuaded, the *Ionia* court adopted the *Jho* court's reasoning, concluding that § 151.25 necessarily imposes a substantive recordkeeping requirement. 555 F.3d at 307–08. "Any other reading would defeat the purpose of MARPOL and the APPS, and would be inconsistent with international law." *Id.* at 308. Unlike the *Jho* court, the *Ionia* court also considered the "plain text of the regulation," noting that "maintain," in the context of recordkeeping, plainly implies a duty to keep "a reasonably *complete* and *accurate* record." *Id.* at 309. Thus, it affirmed the defendants' prosecution under § 151.25 for their conduct. *Id.*

More than a decade passed before the Third Circuit navigated § 151.25's straits in *Vastardis*. 19 F.4th at 579. Like the *Ionia* and *Jho* defendants, the *Vastardis* defendant—a chief engineer on a foreign-flagged vessel— was indicted for maintaining an inaccurate Oil Record Book while in U.S. waters under § 151.25, 33 U.S.C. § 1908(a), and 18 U.S.C. § 2. *Id.* at 578, 581. And like those defendants, the *Vastardis* defendant hoped to duck the charges, arguing that the fraudulent entries occurred "on the high seas," which "divests the United States of the authority to enforce the penalties prescribed under MARPOL." *Id.* at 583.

The *Vastardis* court joined the *Ionia* and *Jho* courts, dismissing defendant's arguments. *Id.* Drawing on § 151.25's plain language, the Third Circuit echoed the *Ionia* court and held that "maintain" in this context imposes a duty

to maintain a record in a state of substantive accuracy. *Id.* It also agreed that such a reading is not only consistent with MARPOL and APPS, but it adheres to those laws' careful division of jurisdictional authority and preserves the integrity of MARPOL. *Id.* at 584. After all, those laws seek to deter unlawful bilge-water dumping, both by encouraging flag states to prosecute high-seas misconduct and encouraging port states to detect high-seas misconduct. *Id.* Thus, the Third Circuit concluded that construing § 151.25's "maintenance" requirement as imposing a substantive obligation to keep records accurate conforms to the regulation's language and the Convention's purpose.

After we heard oral argument and submitted this appeal, the First Circuit issued its decision in *Hornof*. *See* 107 F.4th at 58. Like Korotkiy (and the *Jho*, *Ionia*, and *Vastardis* defendants), the *Hornof* plaintiffs disputed whether § 151.25's recordkeeping requirement properly imposed an obligation on foreign-flagged vessels to maintain accurate Oil Record Books in U.S. waters, as opposed to merely "keep[ing an Oil Record Book] on board." *Id.* at 57–58. The plaintiffs also claimed that it was "untenable to think that the United States cannot prosecute ship owners for failing to properly record their high-seas violations [under MARPOL], but can prosecute the ship for arriving to the United States with an Oil Record Book that has failed to properly record the event [under APPS]." *Id.* at 57.

The *Hornof* court considered the *Jho*, *Ionia*, and *Vastardis* decisions, and it decided not to change tack. *See* 107 F.4th at 58–59. Title "33 C.F.R. § 151.25 is indeed a valid regulation under the jurisdiction of the United States based on its text, and does not circumvent MARPOL or APPS, but instead ensures both are upheld, furthering the objectives prescribed." *Id.* at 59. And the First Circuit

affirmed that it is "unreasonable to conclude that the Coast Guard regulation requires only the preservation of the Oil Record Book in its existing state without accuracy." *Id.* at 58. The Supreme Court has not chosen to review any of these decisions.

**B.**

With the wind from *Jho*, *Ionia*, *Vastardis*, and *Hornof* at our backs, we face § 151.25 and Korotkiy's appeal. "Regulations are interpreted according to the same rules as statutes, applying traditional rules of construction." *Minnick v. Comm'r*, 796 F.3d 1156, 1159 (9th Cir. 2015). "Unless a statute provides an explicit definition, we generally give words 'their ordinary, contemporary, common meaning.'" *Pakootas v. Teck Cominco Metals, Ltd.*, 830 F.3d 975, 980 (9th Cir. 2016) (quoting *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 958 (9th Cir. 2013)). If the meaning of the text is unambiguous, the regulation must be enforced according to its terms. *See King v. Burwell*, 576 U.S. 473, 486 (2015). But when we are confronted with an ambiguous regulation, we must rifle through our "legal toolkit" and "'carefully consider[]' the text, structure, history, and purpose" of the regulation to derive its meaning. *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019) (citing *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 696 (1991) and then quoting *id.* at 707 (Scalia, J., dissenting)); *accord Goffney v. Becerra*, 995 F.3d 737, 742 (9th Cir. 2021). By relying on these classic tools of statutory interpretation, we "resolve many seeming ambiguities out of the box" and avoid most

complicated questions of policy or deference. *Kisor*, 588 U.S. at 575.[6]

**i.**

As always, we start with § 151.25's "plain language." *Minnick*, 796 F.3d at 1159. In relevant part, § 151.25 requires the following:

> (a) Each oil tanker of 150 gross tons and above, ship of 400 gross tons and above other than an oil tanker, and manned fixed or floating drilling rig or other platform shall maintain an Oil Record Book Part I . . . .
>
>  . . . .
>
> (j) The master or other person having charge of a ship required to keep an Oil Record Book shall be responsible for the maintenance of such record.
>
> (k) The Oil Record Book for a U.S. ship shall be maintained on board for not less than three years.

33 C.F.R. § 151.25(a), (j), (k). While the Coast Guard thoroughly details what operations should be recorded in an Oil Record Book, *id.* § 151.25(d)–(g), its regulations neither define "maintenance" nor explain what it means to

---

[6] This appeal does not involve deference to the Coast Guard's interpretation of APPS or its own regulations, so we use "every tool at [our] disposal to determine the best reading" of the regulation to resolve "ambiguity." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024); *cf. Auer v. Robbins*, 519 U.S. 452, 457 (1997) (requiring judicial deference to agencies' interpretations of their own regulations).

"maintain" or be "responsible for the maintenance of such [a] record." Section 151.25's authorizing statute, APPS, is of little help. It too does not define "maintenance," although it uses the term "maintain" fairly regularly in other provisions. *See, e.g.*, 33 U.S.C. §§ 1903(c)(4)(A)(i), 1905(d)(1). And MARPOL does not appear to invoke the term "maintain" at all. *See, e.g.*, MARPOL Annex I, Reg. 17.6; Annex I, Appendix III.

Absent a statutory definition, we follow the Supreme Court's guidance and consider § 151.25's ordinary meaning by, in part, dusting off our dictionaries. *See Garland v. Cargill*,144 S. Ct. 1613, 1620 (2024) (determining the meaning of a statutory term with a dictionary); *Esquivel-Quintana v. Sessions*, 581 U.S. 385, 391–92 (2017) (assessing a term's "everyday understanding" by considering competing dictionary definitions). Since the Coast Guard first promulgated § 151.25's "maintenance" requirement,[7] the transitive verb "maintain" has meant "to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline." *Maintain*, Webster's New Collegiate Dictionary 693 (1977); *see also Maintain*, Webster's New International Dictionary of the English Language 1484 (1959) ("To hold or keep in any particular state or condition, esp. in a state of efficiency or validity."). That's no less true today, as the *Ionia* and *Vastardis* courts determined. *See Maintain*, Merriam-Webster Dictionary 749 (2020); *Ionia*, 555 F.3d at 309; *Vastardis*, 19 F.4th at 583 n.40. The noun "maintenance" has a similar valence. It

---

[7] Pollution Prevention; Implementation of Outstanding MARPOL 73/78 Provisions, 48 Fed. Reg. 45704 (Oct. 6, 1983) ("The requirement for maintaining and submitting an Oil Record Book is an existing requirement.").

is defined as "the act of maintaining" or "the upkeep of property or equipment." *Maintenance*, Merriam-Webster's New Collegiate Dictionary 693 (1977); *Maintenance*, Merriam-Webster Dictionary 749 (2020). As a transitive verb, to maintain thus requires a direct object to indicate what the verb acts upon. And, here, maintaining something involves keeping it in a state of repair, efficiency, and/or validity.

These definitions are helpful, but they arguably introduce some ambiguities. As the government points out, a definition of "maintain" that incorporates preserving a state of "validity" would appear to largely resolve this suit. To maintain "validity" implies that the record in the Oil Record Book must be kept correctly or otherwise relevantly, accurately, and meaningfully, in addition to any other duties to preserve its physical state. But Korotkiy retorts that the dictionary definitions of "maintenance" and "maintain" also suggest obligations distinct from and independent of "validity." To maintain something in a state of "repair," for example, implies that it is liable to break or decay absent intervention. That definition, which Korotkiy favors, focuses on the physical condition of the object and its material preservation. To him, "maintaining" the record in an Oil Record Book exclusively means keeping it in good condition. And while neither party addresses it, "efficiency" feels like a different beast entirely, pulling in shades of productivity and the minimization of waste. Speaking charitably, it seems that the dictionary definition gets us close to but not quite over the finish line.

This is why context, common sense, and usage matter: "[a]fter all, the meaning of a word depends on the circumstances in which it is used." *Biden v. Nebraska*, 143 S. Ct. 2355, 2378 (2023) (Barrett, J., concurring); *King v. St.*

*Vincent's Hosp.*, 502 U.S. 215, 221 (1991) ("[W]e do nothing more, of course, than follow the cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context." (citations omitted)). Take, for instance, "how we use the word [maintain] in everyday parlance." *Mohamad v. Palestinian Authority*, 566 U.S. 449, 554 (2012). For an avid gardener, "maintaining" rosebushes means keeping them healthy and ready to bloom. For an accountant, "maintaining" a business's general journal of financial transactions means keeping track of all in-flows and out-flows of funds, ensuring that those records are accurate, and keeping it up-to-date, so that others can verify its data. And for a mechanic, "maintaining" a truck means keeping it running (often at a surprisingly high price). In each case, "maintenance" entails a dash of putting in the work to keep something up. But that "maintenance" is often tailored to the type of object being maintained. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context."). For a rosebush, it involves physical preservation. For a financial-transactions journal, it involves substantive validity. And for a car, it involves efficiency.

Applying those concepts here, we agree with the *Ionia* court: "[i]n the context of a regulation imposing record-keeping requirements," like § 151.25, "the duty to 'maintain' plainly means a duty to maintain a reasonably *complete* and *accurate* record." 555 F.3d at 309; *see also Vastardis*, 19 F.4th at 583 ("The word 'maintain' in this context requires that the records be substantively accurate."). That makes sense. Section 151.25 regulates a ship's recordkeeping, requiring that entries be recorded in the Oil

Record Book "on each occasion" that certain operations take place, like "[b]allasting or cleaning" fuel oil tanks, discharging "bilge water that has accumulated in machinery spaces," or discharging "overboard of platform machinery space bilge water." *id.* *See generally* 33 C.F.R. § 151.25(d)–(g). This recordkeeping is also mandatory. *Id.* §151.25(h) ("[Each operation] shall be fully recorded without delay in the Oil Record Book so that all the entries in the book appropriate to that operation are completed."). Unlike truck maintenance (which means keeping it running) or rosebush maintenance (which means keeping it alive), record maintenance means keeping the record accurate and useful—just like maintaining a financial-transactions journal. Thus, § 151.25's "maintenance" requirement clearly imposes an obligation on shipping vessels to keep the records in their Oil Record Books accurate, or at least not knowingly inaccurate, while in U.S waters. *See Jho*, 534 F.3d at 403. It does not, as Korotkiy would have it, entail mere physical preservation alone.

Our dissenting colleague does not see things the same way. Like Korotkiy, the dissent concedes that a dictionary definition of "maintain" involves keeping the record in a state of validity. Dissent at 44. But it tosses overboard that troublesome part of the definition as merely one "exemplar," before creating its own custom definition based on a "survey" of multiple dictionaries drawn from a broad assortment of years. Dissent at 44–46. It cites no precedent or practice to justify its approach or such an exclusion. Next, the dissent dismisses out-of-hand our use of everyday examples to derive a common-sense meaning for the word "maintain," despite that being a decades-long practice of both the Supreme Court and our own. *See, e.g.*, *Mohamad*, 566 U.S. at 454 (deriving the "ordinary" and "common

parlance" definition of "individual" by listing multiple everyday examples of its usage); *County of Maui v. Hawaii Wildlife Fund*, 590 U.S. 165, 186 (2020) (using commonsense examples of a term to conclude that "[t]here is nothing unnatural about [our] construction"); *Flores-Figueroa v. United States*, 556 U.S. 646, 650–51 (2009) (determining how "listeners in most contexts" would understand an adverb's meaning by offering everyday examples of its use); *Joffe v. Google, Inc.*, 746 F.3d 920, 928 (9th Cir. 2013) (using examples to understand the "common parlance" meaning of a term). In lieu of such analysis, the dissent then concludes, without much explanation of its own, that the "ordinary meaning of 'maintain'" means "preservation" alone because "retained, available for inspection, and in good enough condition" is a "natural fit in the record-book context[.]" Dissent at 45.

That reading is perplexing. Most folks would scratch their heads if someone promised to maintain a record for them, and then delivered a blank book of records in "good enough condition" for them to turn its empty pages. Dissent at 45. They would think it was a bad joke. They would, in fact, feel like that person's maintenance "d[id] no good." Dissent at 45. To be sure, maintenance may well mean that the Book with the records in them *also* needs to be in good enough physical condition to check it. But "maintenance" of a record cannot, as the dissent would have it, entail mere physical preservation alone and without anything more. Otherwise, there is nothing to check.

As the dissent admits, Dissent at 60, every other circuit judge to have interpreted § 151.25's "maintenance" requirement sees it our way: "[n]o reasonable reader of this regulation could conclude, given the context, that the regulation merely imposes an obligation to preserve the [Oil

Record Book] in its existing state." *Ionia*, 555 F.3d at 309; *Vastardis*, 19 F.4th at 583 ("[Section 151.25's] recordkeeping provision would make little sense if . . . it required that ships only physically possess an Oil Record Book in any state of completeness or accuracy."). This certainly buttresses our conclusion that our reading is the "natural" one.

### ii.

Reading "maintain" to exclusively entail "preservation" is also inconsistent with § 151.25's other provisions. *See F.T.C. v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959) (noting that "our task is to fit, if possible, all parts into an harmonious whole" when interpreting statutes or regulations). Throughout its Oil Record Book regulations, the Coast Guard drew a distinction between how the Oil Record Book is "kept" and how the record of bilge-water operations is "maintained." Take the following provisions:

> (i) The Oil Record Book shall be kept in such a place as to be readily available for inspection at all reasonable times and shall be kept on board the ship.
> (j) The master or other person having charge of a ship required to keep an Oil Record Book shall be responsible for the maintenance of such record.

33 C.F.R. § 151.25(i), (j). The Coast Guard clearly intended for different obligations to attach to "keeping" the Oil Record Book and "maintaining" the "record" within the Book. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000) (opinion of O'Connor, J.) (advising courts to "give effect, if possible, to every clause and word of [the] statute"))

(quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)).  The text of the regulation makes this plain.  On the one hand, the Coast Guard specified that the Book must be "kept" on board—e.g., that it be physically preserved and stored on board, such that it can be inspected.  33 C.F.R. § 151.25(i).  On the other hand, the "master or other person having charge of the ship" required to keep the Book "shall be responsible for the maintenance of such record."  *Id.* § 151.25(j).  Crucially, the object that is to be maintained, here, is the record; it is not just the physical Oil Record Book.  Accordingly, the duty imposed by the term "maintenance" attaches to more than just keeping the physical Oil Record Book; it requires maintaining the "record" itself—e.g., keeping that record substantively accurate (or at least not knowingly inaccurate).

The dictionary, common sense, and everyday usage reflect the distinct obligations imposed by the terms "keep" and "maintain" in the Coast Guard's regulations.  The primary definition of "keep" in Merriam Webster states that "keep" is a transitive verb, meaning "to retain in one's possession or power," "to refrain from granting, giving, or allowing," or "to have in control."  *Keep*, Meriam-Webster's Dictionary (2024), https://www.merriam-webster.com/dictionary/keep; *see also Keep*, Meriam-Webster's Dictionary 631 (1977) ("4a: to retain in one's possession or power . . . b: to refrain from granting, giving, or allowing . . . c: to have in control").  This definition is a natural fit, here.  "Keep" clearly imposes a duty on ships to retain or have in its control a physical Oil Record Book.  After all, ships that are required to "keep" the Book must keep it in an accessible place, on board, so that it may be physically inspected. This obligation, of course, stands in direct contrast to a ship master's additional obligation to

"maintain" a substantively accurate "record" that is logged in that physically kept Book.

Korotkiy and the dissent, however, would read "maintain" and "keep" as synonymous, concluding that both terms only impose an obligation to "physically preserve" an Oil Record Book.  To get there, the dissent decides that it does not like the canon of consistent usage or, its corollary, that distinct words have distinct meanings, and it does not believe that drafters of statutes mean what they write.  Those issues aside, such an interpretation effectively collapses both regulatory terms and their accompanying obligations into one requirement.  That approach contravenes our longstanding obligation to "interpret [a] statute to give effect to all of its parts."  *Estate of Magnin v. Comm'r*, 184 F.3d 1074, 1077 (9th Cir. 1999); *Williams*, 529 U.S. at 404 (opinion of O'Connor, J.).  It also strikes any independent obligations associated with "maintenance" of the "record" from the statute—as opposed to a duty to "keep" the Oil Record Book—thus undermining the Coast Guard's and Congress's clear intent.[8]  *See Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1432 (9th Cir. 1991) (noting that a failure to "distinguish" between related terms would render one of those terms superfluous in a statute).

---

[8] The dissent's invocation of other federal laws proves the point.  In the provisions it cites, Congress distinguished between "failing to maintain an official logbook" and "failing to make an entry in the vessel's official logbook."  46 U.S.C. § 11303(a), (b).  In each, the "official logbook" is the direct object of the obligations to "maintain" and "make an entry in."  By contrast, 33 C.F.R. § 151.25(j) draws a distinction between that which is "kept" (the Oil Record Book) and that which is "maintained" (the record in the Oil Record Book).  At base, both the statute and the regulation are best enforced as they are written.

Our construction of "maintenance" is also consistent with the term's "place in the overall statutory scheme." *See Brown & Williamson*, 529 U.S. at 133 (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)); *cf. Fischer v. United States*, 144 S. Ct. 2176, 2183 (2024) ("[W]e consider both 'the specific context' in which [§ 151.25] appears 'and the broader context of the [regulation] as a whole.'" (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997))).[9] As noted above, APPS—which is § 151.25's authorizing statute—does not define the word "maintain." But it uses the term at least twice. Section 1903, for example, imposes a duty on U.S. ships "to maintain refuse record books and shipboard management plans." 33 U.S.C. § 1903(c)(4)(A)(i). And in § 1905, Congress directed the Coast Guard to "maintain a list of ports or terminals with respect to which a certificate issued under this section—(A) is in effect; or (B) has been revoked or suspended." *Id.* § 1905(d)(1). Like § 151.25, neither of those statutory provisions would make much sense if "maintain" merely meant to "preserve" or "keep." That conclusion rings particularly true for § 1905(d)(1)'s maintenance requirement, which obligates the Coast Guard not just to *have* a list of ports, but to keep that list *accurate* by stating which ports are certified and which are not, and to make the list "available to the general public." *See id.*

---

[9] The dissent begins with a citation to *Pugin v. Garland*, 599 U.S. 600, 605 n.1 (2023), attributing to it the direction that "the most rudimentary rule of statutory construction," is "that courts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part." Dissent at 38. But *Pugin* is addressing an issue of statutory interpretation entirely different from the issue here.

§ 1905(d)(1)–(2).[10] Thus, to keep § 151.25's "maintenance" requirement consistent with APPS, it must impose an obligation on ships to maintain accurate, or at least not knowingly inaccurate, Oil Record Books while in the United States' territorial waters.

Contrary to the dissent's assertions otherwise, our reading of § 151.25's "maintenance" requirement does not conflict with MARPOL's plain terms. The dissent invokes our decision in *Hopson v. Kreps* to explain why it relies on MARPOL's provisions to generate its interpretation of

---

[10] The meaning of "maintain" in § 1905(d)(1)—and the dissent's failure to engage with it—highlights the impossibility of the dissent's proffered definition of maintain as the "preservation of something's condition," Dissent at 45, or to "'preserve' or 'keep in good condition,'" *id.* at 49. If the dissent has it right, Congress instructed the Coast Guard in § 1905(d) to "[preserve or keep in good condition] a list of ports or terminals" whose certificates are either (A) "in effect; or (B) . . . revoked or suspended[,]" and to "make the list . . . available to the general public." 33 U.S.C. § 1905(d). If "maintain a list" means only to keep it in good condition, the Coast Guard would satisfy its statutory mandate by making one list one time, framing it in bulletproof glass, and displaying it in a public place. Such a reading strains credulity. For the word "maintain" to do any work in the statute, it must be viewed in conjunction with that which is to be maintained (like any transitive verb would be). Here, to maintain a "list" imposes an ongoing obligation to accurately record those things that Congress instructs the Coast Guard to include.

The same logic applies to § 151.25. Again, that section provides that the "master or other person having charge of a ship required to keep an Oil Record Book shall be responsible for the maintenance of such record." 33 C.F.R. § 151.25(j). MARPOL mandates that certain operations "shall be fully recorded without delay in the Oil Record Book." Reg. 17, para. 2. Section 151.25(d)–(f) implements MARPOL's requirements. So what does it mean to "maintain[] . . . such record"? C.F.R. § 151.25(j). Similar to "maintain a list" in the context of 33 U.S.C. § 1905(d), "maintain a record" in § 151.25(j) means to record those things which MARPOL instructs vessels to record.

§ 151.25, but it elides *Hopsons*'s key holdings: "The issue in any legal action concerning a statute implementing a treaty is the intended meaning of the terms of the statute." 622 F.2d 1375, 1380 (9th Cir. 1980). "[T]reaties," like MARPOL, "are relevant to the interpretation of congressional enactments only to the extent that Congress makes them relevant." *Id.* But that does not make treaties conclusive, particularly if their terms contradict the plain meaning of APPS or the Coast Guard's regulations. Indeed, as we held in *Hopson*, "[t]he treaty has no independent significance in resolving" issues of statutory or regulatory interpretation, "but is relevant insofar as it may aid in the proper construction of the statute." *Id.*

Here, MARPOL does not use the term "maintain" with respect to Oil Record Books. Instead, under Regulation 17, MARPOL details what should be included in an Oil Record Book. *See* Annex I, Reg. 17. In its implementing regulations, the Coast Guard faithfully mirrored many of those recordkeeping requirements. *See* 33 C.F.R. § 151.25. Separately, under Regulation 17.6, MARPOL requires that an Oil Record Book be "preserved for a period of three years after the last entry has been made." Annex I, Reg. 17.6; *see also* Appendix III. For its part, the Coast Guard provided under § 151.25(k) that "[t]he Oil Record Book for a U.S. ship shall be maintained on board for not less than three years." Korotkiy and the dissent seize on Regulation 17.6 and § 151.25(k) to support their positions, asserting that Regulation 17.6's three-year "preservation" requirement is identical to and implemented by § 151.25(k)'s three-year "maintenance" requirement. In their view, that means we should interpret the latter to be coextensive with the former in every provision of § 151.25, and thus conclude that

"maintain" and "preserve" have the same meaning throughout the Coast Guard's regulations.

As we reasoned in *Hopson*, we "have been persuaded as to the proper interpretation of" the Coast Guard's implementing regulations, and thus need not be overly troubled "that the reading given the statute was [allegedly] inconsistent with the intent of the parties to the treaty."[11] 622 F.2d at 1380 (citing *United States v. Navarre*, 173 U.S. 77 (1899); *Botiller v. Dominguez*, 130 U.S. 238 (1889)). We will not, as the dissent would have it, use MARPOL to trump that plain meaning. *Restatement (Third) of Foreign Relations Law* § 111 comment h ("[I]t is the implementing legislation, rather than the agreement itself, that is given effect as law in the United States."). But we also disagree with Korotkiy's and the dissent's reading of Regulation 17.6 and § 151.25(k). "[S]nipping words from one subsection and grafting them onto another violates our normal interpretive principles." *Fischer*, 144 S. Ct. at 2196 (Barrett, J., dissenting); *Dean v. United States*, 556 U.S. 568, 572 (2009) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face." (quoting *Bates v. United States*, 522 U.S. 23, 29 (1997))). And, despite both provisions referring to a three-year timeframe, the plain language of each imposes two very different obligations. Regulation 17.6's "preservation" requirement directs a ship to keep an Oil Record Book for a three-year period beginning on the date of the book's "last entry"—effectively requiring ships to keep an archived version of their filled-out

---

[11] *See also Safety Nat. Cas. Corp. v. Certain Underwriters At Lloyds, London*, 587 F.3d 714, 726 ("The Ninth Circuit observed . . . that an implementing statute should be given its plain meaning even if that interpretation conflicts with the treaty it implements.").

books on board. By contrast, § 151.25(k) does not require ships to keep old volumes of their Oil Record Book aboard for three years from the date of their last entry. Rather, § 151.25(k) directs ships to "maintain" an Oil Record Book for at least three years—by its plain terms, effectively requiring ships to maintain an *active* Oil Record Book, with three years' worth of entries. Thus, the duty to "preserve" and the duty to "maintain" are distinct, and MARPOL's archiving requirement has little bearing on the Coast Guard's requirement that ships maintain substantively accurate records of bilge-water operations. Or, put another way, MARPOL's invocation of "preservation" does not limit or otherwise define the Coast Guard's use of "maintenance."[12]

### iii.

As the *Vastardis*, *Jho*, *Ionia*, and *Hornof* courts reasoned, our interpretation of § 151.25's "maintenance" requirement is also consistent with APPS's and MARPOL's legislative purpose. *See Abramski v. United States*, 573 U.S. 169, 179 (2014) (noting that courts must not interpret regulatory language "in a vacuum, but with reference to the statutory context, 'structure, history, and purpose'" (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013))); *see also Fischer*, 144 S. Ct. at 2192 (Jackson, J., concurring)

---

[12] The dissent raises hypothetical challenges related to enforcement, none of which have much relevance here. We would also pose our own. If, as the dissent has it, an Oil Record Book shall be "[kept] on board for not less than three years," 33 C.F.R. § 151.25(k), would a "newly chartered ship immediately stand in violation" of the regulation for not having one? Likewise, under a reading of § 151.25 that only imposes a duty to preserve an Oil Record Book, will ship masters face criminal liability if their books are stained, their bindings loose, or a page ripped out? What if a coffee ring obscures an entry? What is "good enough condition," Dissent at 45, for a ship's master to avoid prison time?

("Discerning the rule's purpose is critical when a court is called upon to interpret the provision."). When Congress enacted APPS to implement MARPOL, it broadly directed the Coast Guard to enforce the Convention by "prescrib[ing] any necessary or desired regulations to carry out" its provisions. *See* 33 U.S.C. § 1903(a), (c). And Congress gave those implementing regulations teeth, making it a felony for a person to knowingly violate "the MARPOL Protocol," APPS, or the Coast Guard's regulations. *Id.* § 1908(a).

That grant of regulatory authority under APPS—coupled with Congress's explicit direction that violations of those protocols be federally prosecuted—was not "accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quoting *Whitman v. Am. Trucking Ass'ns., Inc.*, 531 U.S. 457, 468 (2001)). It was, instead, direct; and Congress explicitly used plain terms like "necessary or desire," 33 U.S.C. § 1903(c)(1), to enlarge "agency discretion," *see Arlington v. FCC*, 569 U.S. 290, 296 (2013).

Of course, Congress did not grant boundless authority to the Coast Guard. It imposed two limitations on the Coast Guard's regulations. First, any actions taken by the Coast Guard under APPS "shall be taken in accordance with international law." 33 U.S.C. § 1912. And second, the Coast Guard's recordkeeping requirements for foreign-flagged vessels shall apply only when those ships are "in the navigable waters of the United States." 33 U.S.C. § 1902(a)(2).

Here, prosecution under § 151.25 is consistent with Congress's express guidance and limitations. *See Hornof*, 107 F.4th at 58, 59 n.14. At its core, MARPOL seeks to

prevent oceanic pollution. Art. 1(1), 1340 U.N.T.S. at 184; *Vastardis*, 19 F.4th at 577. To achieve that end, MARPOL and APPS afford flag and port states concurrent jurisdiction to enforce the Convention's obligations. *Jho*, 534 F.3d at 403 n.3. MARPOL directs flag states, consistent with the longstanding "law of the flag" doctrine, to prosecute high-seas misconduct committed by their ships. *Id.* at 405–06. And MARPOL empowers port states in their "key role [of] *detecting* (if not prosecuting) such misconduct," and reporting that misconduct back to flag states. *Vastardis*, 19 F.4th at 584, 585; *see also* MARPOL art. 6(2), 1340 U.N.T.S. at 187. Thus, MARPOL contemplates that flag and port states will work together, and the Convention "depends on member states being able to report violations to flag states." *Ionia*, 555 F.3d at 308. That purpose would not be served by a regulation that merely requires shipping vessels to preserve and present Oil Record Books in any state of accuracy or validity to U.S. Coast Guard officials.

The *Vastardis* court said it well: "the ability of port states to refer violations to flag states hinges on the reliability of foreign ships' Oil Record Books, which port officers like the Coast Guard review in conducting inspections." 19 F.4th at 584. An obligation to provide an accurate Oil Record Book thus helps the U.S. Coast Guard determine if there have been unlawful high seas bilge-water discharges. By contrast, "[i]f foreign ships were free to maintain falsified Oil Record Books in U.S. ports, then 'the Coast Guard's ability to conduct investigations against foreign-flagged vessels would be severely hindered.'" *Id.* at 584–85 (quoting *Jho*, 534 F.3d at 403). Under Korotkiy's reading of the regulation, a ship's crew would be compliant with § 151.25's implementation of MARPOL if they provided Coast Guard inspectors with (1) a fraudulent Oil Record

Book; or, as here, (2) an inaccurate, fraudulent, and incomplete Oil Record Book.  In each scenario, these books might be well-kept—or even "preserved," to use Korotkiy's language.  But they would be useless in the effort to halt oceanic pollution or deter repeat infringers.[13]  An opinion blessing such recordkeeping would, therefore, directly undermine MARPOL and APPS, impeding a port state's ability to detect wrongdoing, refer that wrongdoing to a flag state, and comply with the Convention's provisions.[14]

---

[13] As ever, we do our best to avoid "statutory interpretations which would produce absurd results."  *Ma v. Ashcroft*, 361 F.3d 553, 558 (9th Cir. 2004).

[14] The dissent notes that the circuit courts to address this issue dealt with Coast Guard investigations prompted not by a recordkeeping discrepancy but because of a whistleblower.  Dissent at 63–66.  It concludes that accurate recordkeeping must not be very important, then, when enforcing MARPOL or APPS.  Dissent at 64–65.  But the dissent undermines its own point when it asserts that "[i]n order 'to verify whether or not the ship has discharged a harmful substance in violation of the MARPOL Protocol,' [33 U.S.C. § 1907(c)(2)(A)], the Coast Guard may examine the ship and its 'oil content meter continuous records,' and may thereby discern a discrepancy with Oil Record Book entries.  33 C.F.R.  151.23." Dissent at 63–64.  How any discrepancy would be discerned without a substantively accurate record is unclear.  The dissent insists that a "substantive accuracy" determination can be established through requiring the "Master of the ship" to "certify that the copy [of any entry in the Oil Record Book] is a true copy of such entry."  Dissent at 66 n.8 (quoting 33 C.F.R. § 151.23(c)).  And, because this mechanism exists, the dissent asserts that "maintain" does not impose a substantive accuracy requirement.  *Id.*  But the dissent isolates the sentence outlining the Master of the ship's certification process from the preceding sentence making up subsection (c): "[a]n inspection under this section *may include an examination of the Oil Record Book*, the oil content meter continuous records, and a general examination of the ship.  A copy of any entry in the Oil Record Book may be made and the Master

Moreover, our reading—which permits prosecution for maintenance of a knowingly inaccurate Oil Record Book in U.S. territorial waters—does not contravene international-law restrictions on port-state jurisdiction over high-seas misconduct. "[N]othing in [MARPOL] or the APPS . . . provides express or implied consent to surrender the United States' concurrent jurisdiction over violations of the APPS occurring on foreign ships while docked at U.S. ports." *See United States v. Pena*, 684 F.3d 1137, 1147 (11th Cir. 2012); *see also Mali v. Keeper of the Common Jail*, 120 U.S. 1, 11 (1887) ("It is part of the law of civilized nations that, when a merchant vessel of one country enters the ports of another for the purposes of trade, it subjects itself to the law of the place to which it goes."); *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 124 (1923) ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute."). And the APPS and its accompanying regulations do no more than impose "criminal liability for foreign vessels and personnel only for those substantive violations of MARPOL that occur in U.S. ports or waters." *Abrogar*, 459 F.3d at 435; *Jho*, 534 F.3d at 405. That is what we have here.

---

of the ship may be required to certify that the copy is a true copy of such entry." 33 C.F.R. § 151.23(c) (emphasis added). For what purpose other than inspecting whether accurate compliance with the record requirements of 33 C.F.R. § 151.23(d), (e), and (f), would this "examination of the Oil Record book" fulfill? *Id.* And, additionally, this evidence was relevant to this case. Regardless, not only does the dissent feel entitled to narrow the available evidence on which the Coast Guard may rely (apparently, they already have enough, Dissent at 65–66), but its analysis rests on a classic error of sampling bias. Just because these whistleblower cases saw appellate review does not mean that they represent all, or even many, of the routine Coast Guard enforcement actions related to Oil Record Book violations. We decline to implement such a rule in such a vacuum of evidence.

Korotkiy's indictment made it clear that he caused the failure to maintain the record in the MV *Donald*'s Oil Record Book "[o]n or about May 31, 2022, in the port of San Diego, and within the Southern District of California." *See Jho*, 534 F.3d at 403 ("[W]e read the indictment to allege eight knowing failures to maintain an oil record book that each occurred entirely within the ports of the United States."). Because Korotkiy does not challenge the sufficiency of the evidence, we merely consider whether the conduct alleged in the indictment is unlawful. *See, e.g.*, *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952). At base, Korotkiy chose to aid and abet an unlawful act while in U.S. waters, opening himself to prosecution here.

#### iv.

Finally, we reject Korotkiy's request that we apply the rule of lenity in this case to construe § 151.25 in his favor. Under that rule, "[i]f a federal criminal statute is grievously ambiguous, then the statute should be interpreted in the criminal defendant's favor." *Wooden v. United States*, 595 U.S. 360, 377 (2022) (Kavanaugh, J., concurring). But that rule applies "'only if, after seizing everything from which aid can be derived,' the Court 'can make no more than a guess as to what Congress intended.'" *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (quoting *Muscarello v. United States*, 524 U.S. 125, 138–39 (1998)). As demonstrated above, § 151.25 is not "grievously ambiguous." Not even close. Its plain terms unambiguously impose a duty to maintain accurate (or at least not knowingly inaccurate) Oil Record Books while in the territorial waters of the United States. Accordingly, like so many "interpretive conundrums," the supposed ambiguities in § 151.25 can "be solved" by applying the familiar tools in

our "legal toolkit," *Kisor*, 558 U.S. at 575, and we need not resort to the rule of lenity, *Ocasio*, 578 U.S. at 295 n.8.

## C.

In the alternative, Korotkiy asks us to reverse the district court's decision because he is not a "shipmaster" and, thus, not bound by § 151.25's maintenance requirement. In support, he invokes the Fifth Circuit's decision in *United States v. Fafalios*, which held that, "under the plain language of the regulations," only the master of a ship can be charged with directly failing to maintain a substantively accurate Oil Record Book. 817 F.3d 155, 159 (5th Cir. 2016) (considering 33 C.F.R. § 151.25(j) ("The master or other person having charge of a ship required to keep an Oil Record Book shall be responsible for the maintenance of such record.")). That might be true, but that holding is immaterial to this case. Here, Korotkiy was charged with "caus[ing] the failure to maintain an Oil Record Book" under both § 151.25 and the federal aiding-and-abetting statute, 18 U.S.C. § 2(b). Courts, including the *Fafalios* court, uniformly agree that "chief engineers can be prosecuted," as Korotkiy was, for "aiding and abetting the failure to maintain an accurate record book." 817 F.3d at 162; *Vastardis*, 19 F.4th at 589 ("[The defendant] aided the ship's presentation of a falsified Oil Record Book to U.S. officials and deceived them during an authorized inspection in an attempt to conceal the improper discharges."); *Jho*, 534 F.3d at 402 n.1 (permitting "aiding and abetting the oil record book

offenses" to proceed).[15]  Korotkiy offers no reason for us to hold otherwise.

## IV.

In sum, the *Ionia*, *Jho*, *Vastardis*, and *Hornof* courts have all considered and rejected arguments resembling Korotkiy's, uniformly holding that 33 C.F.R. § 151.25 imposes a duty upon foreign-flagged vessels to maintain accurate (or at least not knowingly inaccurate) Oil Record Books while in U.S. territorial waters.  Korotkiy does not offer a "compelling reason" to chart a separate course and "create a circuit split." *Padilla-Ramirez v. Bible*, 882 F.3d 826, 836 (9th Cir. 2017).  Given § 151.25's plain language and the law's purpose, we decline his invitation to do so and affirm the district court's order.

**AFFIRMED.**

---

[15] *See also United States v. Oceanic Illsabe Ltd.*, 889 F.3d 178, 199 (4th Cir. 2018) ("Viewed in the proper light, Chief Ignacio and Samson aided and abetted Master Tabacaru's failure to maintain an accurate Oil Record Book."); *United States v. Empire Bulkers Ltd.*, 583 F. Supp. 3d 746, 753 (E.D. La. 2022) ("[The defendant's] status as chief engineer rather than master does not require dismissal of [the aiding and abetting count]."); *United States v. MST Mineralien Schiffarht Spedition Und Transport GmbH*, 2018 WL 522764, at *4 (D. Me. Jan. 22, 2018) ("[The government] can also bring a criminal prosecution against a chief engineer under an aiding and abetting theory."); *United States v. DSD Shipping, AS*, 2016 WL 1369451, at *3 (S.D. Ala. Apr. 6, 2016) ("[T]he Court finds there was sufficient evidence from which a jury could find that the Defendants aided and abetted the failure to maintain record books in violation of 18 U.S.C. § 2.").

N.R. SMITH, Circuit Judge, dissenting:

The MARPOL treaty, the Act to Prevent Pollution from Ships (APPS), 33 U.S.C. §§ 1901–1913, and their implementing regulations all require that MARPOL violations occurring in international waters be referred to a vessel's flag nation for enforcement.  Yet here, my colleagues authorize the domestic prosecution of extraterritorial recordkeeping violations by pressing into service a purported duty to accurately "maintain" government-owned record books and so permit their inspection.  Their decision strains the ordinary meaning of the authorities they interpret and ignores "the most rudimentary rule of statutory construction," that is, "that courts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part."  *Pugin v. Garland*, 599 U.S. 600, 605 n.1 (2023) (cleaned up).  To be sure, my colleagues follow in a wide wake, as several of our sister circuits have likewise concluded that such domestic prosecutions simply must be authorized.  But because this interpretation (like that of our sister circuits) is unmoored from the ordinary meaning, structure, and purpose of the regulation at issue, I cannot get on board.

I

The MARPOL Protocol addresses the "deliberate, negligent or accidental release of oil and other harmful substances from ships" through "cooperat[ion] in the detection of violations and the enforcement of [the Convention's] provisions."  MARPOL pmbl. & art. 6(1), 1340 U.N.T.S. 61, 184, 187.  In the United States, this cooperative approach is implemented by APPS and by regulations promulgated under its authority, at 33 C.F.R. §§ 151.09–.29.  Here, we must interpret section 151.25,

which implements MARPOL's Oil Record Book requirements.

## A

As a convention addressing "the need to preserve the human environment in general, and the marine environment in particular," MARPOL addresses conduct occurring in both territorial and international waters. MARPOL pmbl., 1340 U.N.T.S. at 185. The treaty therefore requires each signatory to prohibit ships operating under its flag or control from violating MARPOL, and to sanction those ships for a violation "wherever the violation occurs." MARPOL art. 4(1). In the United States, these requirements are carried out in APPS, which applies "to a ship of United States registry or nationality, or one operated under the authority of the United States, wherever located," and to other ships, as relevant here, "while in the navigable waters of the United States." 33 U.S.C. § 1902(a)(1), (2). The regulations at issue likewise apply to various ships that are "operated under the authority of the United States" or that are "operated under the authority of [another] country . . . while in the navigable waters of the United States, or while at a port or terminal under the jurisdiction of the United States." 33 C.F.R. § 151.09(a).

Although signatories must enforce MARPOL within their respective jurisdictions, and may directly sanction violations occurring therein, they must otherwise "furnish . . . evidence, if any, that [a] ship has discharged harmful substances . . . in violation of" MARPOL to the government of the ship's flag state. MARPOL arts. 4(2), 6(2) & 6(3), 1340 U.N.T.S. at 186–87. In turn, that government must investigate and initiate enforcement proceedings, if appropriate. MARPOL art. 6(4), 1340 U.N.T.S. at 187. To

help detect violations and refer such violations for enforcement, ships to which MARPOL applies are "subject to inspection by officers appointed or authorized by" a signatory while "in any port or off-shore terminal" of the signatory. MARPOL art. 6(2), 1340 U.N.T.S. at 187. A signatory may investigate MARPOL compliance on its own initiative, or may act on another signatory's request for investigation, in which case it must report the results of its investigation to the requesting signatory and to the ship's flag state "so that the appropriate action may be taken." MARPOL art. 6(5), 1340 U.N.T.S. at 187.

In the United States, federal law implements these requirements. *See* 33 U.S.C. § 1907. Section 1907(c) permits inspections under substantively identical terms as MARPOL Article 6 and, "if an inspection . . . indicates that a violation has occurred," requires that the Department of Homeland Security, "in coordination with the [Department] of State, . . . take any additional action required by Article 6" of MARPOL.

B

The substantive legal requirements relevant in this case concern the handling of oil and oily bilge water, along with related recordkeeping. Even during normal operations, some amount of oil-based products (which ships use or transport) may be lost during (for example) loading and unloading, transfer between cargo tanks, or tank cleaning. Because of this, oil or oil residue may mix with water in a ship's bilge. MARPOL requires covered ships to use filtering and discharge-monitoring equipment to ensure that oil and oily mixtures are not discharged overboard. It also requires covered ships to log various operations and events in an Oil Record Book.

MARPOL's anti-discharge provisions, as relevant here, are found in Annex I, Regulations 4 and 15. These provisions establish requirements and exceptions for the maximum oil content of oily mixtures discharged into the sea, the use of certain equipment, and the on-board retention of oil residues that cannot be discharged in compliance with MARPOL's requirements. The requirements of Regulation 15 are enacted domestically in 33 C.F.R. § 151.10, while 33 C.F.R. § 151.11 enacts the first two provisions of Regulation 4 nearly word-for-word.

To address discharges that do occur, MARPOL Article 8 establishes a reporting scheme such that affected signatories and the vessel's flag nation may be notified, 1340 U.N.T.S. at 188, and federal law requires incidents to be reported "in the manner prescribed by Article 8," 33 U.S.C. § 1906. The particulars of the reporting scheme are set out in Protocol I to the treaty, which 33 C.F.R. § 151.15 enacts with only minor variation.

MARPOL's Oil Record Book requirements are set out in Annex I, Regulation 17. It requires that covered ships be provided with an Oil Record Book, which must be used to document operations involving oil products or tanks; discharges of bilge water, oil, or oily mixtures; and failures of oil filtering equipment, among others. Operations must be "fully recorded without delay," and record-book entries must be signed, as must completed pages. The Oil Record Book must be readily available for inspection on board the ship and must be preserved for three years after completion. Regulation 17 is given domestic effect by 33 C.F.R. § 151.25, which closely follows its structure and, in many provisions, directly adopts its language.

C

While the Liberian-flagged MV *Donald* was in international waters, Denys Korotkiy ordered discharges of oily bilge water, then failed to log the discharges in the *Donald*'s Oil Record Book. Because these acts occurred outside the United States and the *Donald* is not a domestically flagged vessel, MARPOL's anti-discharge and contemporaneous-recordkeeping provisions could not be the basis of a domestic prosecution. However, because the *Donald*'s Oil Record Book did not reflect its extraterritorial dumping, the government charged Korotkiy with violating 33 C.F.R. § 151.25 by "knowingly fail[ing] and caus[ing] the failure to maintain an Oil Record Book" while in the Port of San Diego, where the *Donald* was inspected. Korotkiy challenges his conviction under that charge.

The government's prosecution of Korotkiy hinges on its view that section 151.25's mandate to "maintain" an Oil Record Book "requires that [Oil Record Book] records be substantively accurate" whenever a vessel is within United States waters or at one of its ports. The government's interpretation of the regulation cannot be sustained under normal modes of interpretation. I would therefore vacate Korotkiy's conviction under that charge.

II

We must interpret regulations consistently with the statute they implement, *see Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 609 (2013), and "[i]n discerning the meaning of regulatory language, our task is to interpret the regulation as a whole, in light of the overall statutory and regulatory scheme," *Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1171 (9th Cir. 2022) (citation omitted). To accomplish this, we turn to a familiar set of tools, as "[r]egulations are interpreted

according to the same rules as statutes." *United States v. Shih*, 73 F.4th 1077, 1093 (9th Cir. 2023) (citation omitted). Thus, "our analysis must begin with the language of the regulation," *Mountain Cmtys. for Fire Safety v. Elliot*, 25 F.4th 667, 676 (9th Cir. 2022) (citation omitted), but "[o]ur 'legal toolkit' includes careful examination of 'the . . . structure, history, and purpose of a regulation'" as well, *Amazon.com, Inc. v. Comm'r*, 934 F.3d 976, 984 (9th Cir. 2019) (quoting *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019)).

Of course, where statutes and regulations give domestic effect to a treaty, the treaty "may aid in the proper construction of the statute[s]" and regulations implementing it. *Hopson v. Kreps*, 622 F.2d 1375, 1380 (9th Cir. 1980). That is especially true here. APPS directs the Secretary of Homeland Security to "administer and enforce the MARPOL Protocol" and to "prescribe any necessary or desired regulations to carry out the provisions of the MARPOL Protocol" and APPS. 33 U.S.C. § 1903(a), (c)(1). To that end, APPS and its implementing regulations are tightly coupled with MARPOL, often mirroring its structure or directly adopting its language.

## A

Our first port of call is the text of the regulation Korotkiy allegedly violated. Section 151.25 uses forms of the word "maintain" in three of its provisions:

> (a) Each [covered vessel] shall maintain an Oil Record Book Part I . . . .

> (j) The master or other person having charge of a ship required to keep an Oil Record Book shall be responsible for the maintenance of such record.

(k) The Oil Record Book for a U.S. ship shall be maintained on board for not less than three years.

Neither APPS nor its implementing regulations define "maintain," and generally, "we give undefined terms their ordinary meaning." *Shih*, 73 F.4th at 1092.

1

"Ordinarily, a word's usage accords with its dictionary definition," *Yates v. United States*, 574 U.S. 528, 537 (2015), so "consulting common dictionary definitions is the usual course," *Cal. All. of Children & Fam. Servs. v. Allenby*, 589 F.3d 1017, 1021 (9th Cir. 2009).

A survey of common dictionaries' definitions of "maintain" reveals a consistent focus on continuity: *Webster's* defines it first as "to keep in a state of repair, efficiency, or validity: preserve from failure or decline." *Maintain*, *Webster's Third New Int'l Dictionary, Unabridged* (2002). *Collins* defines it first as "to continue or retain; keep in existence," then "to keep in proper or good condition." *Maintain*, *Collins English Dictionary* (12th ed. 2014). The *Oxford Dictionary of English* defines it first as "cause or enable (a condition or situation) to continue," "keep (something) at the same level or rate," or "keep (a building, machine, or road) in good condition by checking or repairing it regularly." *Maintain*, *Oxford Dictionary of English* (3d ed. 2010). And *Black's* defines it first as "[t]o continue (something)," then as "[t]o continue in possession of (property, etc.)," and further as "[t]o care for (property) for purposes of operational productivity or appearance." *Maintain*, *Black's Law Dictionary* (12th ed. 2024).

All of these emphasize preservation of something's condition.  This ordinary meaning of "maintain" is a natural fit in the record-book context; after all, a record book does no good if it is not retained, available for inspection, and in good enough condition to inspect.  Subsections (a) and (k) connect forms of the word "maintain" to the "Oil Record Book" itself, while subsection (j) connects the word "maintenance" to "such record" in an "Oil Record Book". 33 C.F.R. § 151.25(a), (j), (k).

2

In concluding that "maintain" concerns the accuracy of a book's contents, my colleagues instead emphasize a single exemplary term from a single dictionary definition—though the term does not appear in the relevant provisions of MARPOL, APPS, or section 151.25.  Like our sister circuits, they rely on the *Webster's* definition of maintain as "to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline."  *Maintain*, *Webster's New Collegiate Dictionary* (1977).  They state that that validity aspect of the definition of maintain "gets us close to but not quite over the finish line."  Maj. Op. at 19.

It should go without saying that the ordinary meaning of a term is not given by a single usage exemplar in a single dictionary, much less an exemplar cleaved from the surrounding definitional content.[1]  In the *Webster's* definition, that content relates "maintain" to the actions of *keeping* and *preserving* something in its existing state.  It is in that context that "validity" is a relevant illustration—not

---

[1] My colleagues rightly caution that "[s]nipping words from one subsection and grafting them onto another violates our normal interpretive principles," Maj. Op. at 29 (citation omitted), but surely snipping words from a dictionary definition sails even closer to the wind.

a definition unto itself. Instead, maintenance is defined as continuity by drawing on multiple dictionaries, and justified by showing that that definition consistently comports with the dictionaries' first definitions of "maintain" and excludes an outlier definition in favor of a ubiquitous one. No analogies needed.

In focusing on examples selected by *Webster's*, my colleagues concede that the definitions "arguably introduce some ambiguities." Maj. Op. at 19. To resolve these, although they acknowledge that "context, common sense, and usage matter," they instead turn to questionable analogies to guide how "maintenance" often must be "tailored to the type of object being maintained." Maj. Op. at 19, 20 (citation omitted). First, my colleagues tell us that "maintaining" rosebushes means "keeping them healthy and ready to bloom," and so has a sense of "physical preservation." Maj. Op. at 20. That does not explain why "maintaining" a record book aboard a ship would not similarly require "keeping it dry and ready to be inspected." Then, they suggest that a different analogy may be a better fit: having described an accountant "maintaining" a business's general journal of financial transactions by "ensuring that those records are accurate, and keeping it up-to-date," Maj. Op. at 20, they assert that "record maintenance means keeping the record accurate and useful—just like maintaining a financial-transactions journal," Maj. Op. at 21. This bare assertion assumes the conclusion, rather than explaining it, but the analogy in any event would not resolve the issue here. Just as an accountant fails to maintain its journal when and where he or she fails to keep it up to date, Korotkiy's failure to perform maintenance by not making the requisite entries took place when the obligation to do so arose in international waters,

long before the *Donald*'s arrival in the Port of San Diego. Moreover, "maintain" as used in section 151.25 is a transitive verb with "Oil Record Book" as its direct object: there is nothing "perplexing" or head-scratching about being asked by someone to "maintain" a book, then returning the book blank. Maj. Op. at 22. Something more than the word "maintain" is needed to generate a substantive accuracy requirement on that person's part before their actions can be described as "a bad joke." Maj. Op. at 22.

## B

These difficulties are avoided in our normal mode of interpretation, whereby we "exhaust all the textual and structural clues bearing on [the] meaning" of a provision. *Niz-Chavez v. Garland*, 593 U.S. 155, 161 (2021). Even if the ordinary meaning of "maintain" were not straightforwardly applicable and other textual and structural clues were to leave us at sea, we resolve our doubts by reference to "the overall statutory and regulatory scheme" of which the regulation is a part, *Safari Club Int'l*, 31 F.4th at 1171, rather than through analogies of my colleagues' own creation, *see* Maj. Op. at 20-21.

## 1

Section 151.25's other references to "maintain" and to the "maintenance" of an Oil Record Book confirm a sense of preservation, rather than accuracy. Beyond the general requirement to "maintain an Oil Record Book," 33 C.F.R. § 151.25(a), the regulation states:

> (i) The Oil Record Book shall be kept in such a place as to be readily available for inspection at all reasonable times and shall be kept on board the ship.

(j) The master or other person having charge
    of a ship required to keep an Oil Record
    Book shall be responsible for the
    maintenance of such record.

(k) The Oil Record Book for a U.S. ship shall
    be maintained on board for not less than
    three years.

These provisions link maintenance to the necessity of
inspection, by specifying where the Oil Record Book shall
be kept, by whom, and for how long.  Even in these
provisions related to inspection, where accuracy would be a
most salient concern, nothing in the text of the regulation
links maintenance to a substantive standard.  Just the
opposite: section 151.25(k) requires that an Oil Record Book
be "maintained on board for not less than three years," which
surely does not imply that its contents may later be made
inaccurate—except by virtue of the fact that the Book need
no longer be preserved at all.

My colleagues suggest that, in these paragraphs, the
Coast Guard "drew a distinction between how the Oil
Record Book is 'kept' and how the record of bilge-water
operations is 'maintained,'" and that it "clearly intended for
different obligations to attach to" each term.  Maj. Op. at 23.
Of course, there is a sensibility to the "natural presumption
that identical words used in different parts of the same [text]
are intended to have the same meaning," *Atl. Cleaners &
Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932), and
the corollary that different terms in a provision have
different meanings.  But there "is no rule of statutory
construction which precludes the courts from giving to the
word the meaning which the Legislature intended it should
have in each instance," *id.*, and while helpful, the canon of

consistent usage "assumes a perfection of drafting that, as an empirical matter, is not often achieved," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012). In the face of contrary textual evidence, the presumption that different terms carry different meanings must give way.

Using a different dictionary than for "maintain," my colleagues primarily define "keep" as "to retain in one's possession or power," "to refrain from granting, giving, or allowing," or "to have in control." Maj. Op. at 24. They hold that "[t]his definition is a natural fit, here" as "keep" imposes the requirement that the Oil Record Book be accessible on board for physical inspection, while "maintain" carries a burden of substantive accuracy. Maj. Op. at 24-25.

However, contrary to my colleagues' contention, *see* Maj. Op. at 22, "maintain" and "keep" do different work and need not be read as synonyms under this interpretation. No disharmony arises when reading "maintain" within section 151.25 to mean "preserve" or "keep in good condition," because keeping something in good condition (i.e., maintaining it) is not the same thing as simply keeping it, or keeping it in one's possession. Thus, while paragraphs (i) and (k) each require certain treatment of an Oil Record Book "on board" a ship, paragraph (i)'s specification of *where* an Oil Record Book shall be kept ("in such a place as to be readily available for inspection at all reasonable times" and "on board the ship,") is compatible with paragraph (k)'s requirement that it be maintained, or kept in a certain condition.

Rather, my colleagues are the ones who chart the wrong course from the start by attempting to distinguish "keep" and

"maintain" at any cost, given that section 151.25 itself interchanges the terms. They emphasize that section 151.25(j) speaks to both ships "required to keep" an Oil Record Book and responsibility "for the maintenance of such record." Maj. Op. at 23. But they disregard the fact that paragraphs (a) and (k) require ships not to *keep* an Oil Record Book, but to *maintain* one.

Incidentally, section 151.25 is not the only area of maritime recordkeeping law to use "maintain" in the sense of possession, and to distinguish maintenance from substantive recordkeeping: the federal law governing official logbooks for domestically flagged vessels does the same. *See* 46 U.S.C. §§ 11301, 11303. Section 11301(a) states that certain vessels "shall have an official logbook," while § 11303(a) penalizes "failing to maintain an official logbook." In parallel, § 11301(b) requires "[t]he master of the vessel" to "make or have made" particular entries, while § 11303(b) penalizes "failing to make an entry in the vessel's official logbook as required." At least as regards ships' logbooks, therefore, *maintaining* and *having* seem to have been comparable in the eyes of Congress, while *maintaining* and *making an entry as required* seem to have been distinct. My colleagues' rebuttal on this point, *see* Maj. Op. at 25 n.8, does not address Congress's contrast in section 11301 between the separate, substantive obligations to "have" an official logbook and to "make or have made" entries in the logbook. 46 U.S.C. § 11301(a), (b). That contrast is meaningful. Such contrary textual evidence is sufficient to depart from the canon of consistent usage.

2

That "maintain" need not incorporate an element of substantive accuracy is illustrated by comparison to the

substantive recordkeeping requirements that section 151.25 directly sets out. My colleagues conclude that "§ 151.25's 'maintenance' requirement clearly imposes an obligation on shipping vessels to keep the records in their Oil Record Books accurate." Maj. Op. at 21. But it is the other provisions of section 151.25 that specify what must be entered in the Oil Record Book and when an entry must be made.

The occasions on which "[e]ntries shall be made in the Oil Record Book" are enumerated in section 151.25(d)–(f), which apply to different types of vessels, and in section 151.25(g), which concerns "emergency, accidental, or other exceptional discharges." Paragraph (h) then specifies that "[e]ach operation described in paragraphs (d), (e) and (f) . . . shall be fully recorded without delay in the Oil Record Book *so that all the entries in the book appropriate to that operation are completed*." 33 C.F.R. § 151.25(h) (emphasis added). It further requires entries to "be signed by the person or persons in charge of the operations concerned" and for "each completed page" to be "signed by the master or other person having charge of the ship." *Id.*

By requiring an entry to be "fully recorded without delay" "on each occasion," and by requiring attestation to each individual entry as well as each completed page of entries, section 151.25 demands a continuously updated running log of the events it regulates. The regulation even says as much. Thus, there is no doubt that section 151.25 requires Oil Record Books to be accurate—but contrary to the government's interpretation, that requirement is instantiated in the regulation's detailed specification of events that must be recorded "fully" and "without delay," not the general requirement to "maintain an Oil Record Book." By reading a substantive accuracy requirement into

paragraph (a), my colleagues leave the regulation's contemporaneous-recordkeeping provisions adrift in the doldrums.

C

Our task could start and end with the ordinary meaning of "maintain." To "care for" a record book, "keep [it] in good condition," or "preserve [it] from decline" carry no implication of retroactively making its contents accurate. That is true even under the definition most favorable to the government, "to keep in a state of repair, efficiency, or validity," *Maintain*, *Webster's Third New Int'l Dictionary, Unabridged* (2002), because keeping something in a state of validity involves addressing invalidity as it arises, not covering up one's earlier failure to log an event "without delay," 33 C.F.R. § 151.25(h). Other features of section 151.25 drive this home, but my colleagues' reading gives no credit to those provisions that directly mandate complete and accurate recordkeeping. Nor does such a reading account for the regulation's treatment of "maintain" and "keep" as interchangeable, which matches Congress's approach in nearly identical statutory provisions.

If there were any lingering doubt, however, it is resolved by "the context of the *corpus juris* of which [the regulation is] a part," *Pugin*, 599 U.S. at 605 n.1 (citation omitted),[2] particularly by comparison to MARPOL itself. Section 151.25 is statutorily authorized in order to "carry out the provisions of the MARPOL Protocol," 33 U.S.C. § 1903(c)(1), and in the wake of amendments to MARPOL, the Coast Guard updated its regulations "to harmonize

---

[2] *Pugin* does address a distinct issue of statutory interpretation, but its "most rudimentary rule" remains relevant here. *See* Maj. Op. at 26 n.9.

[them] with international conventions," MARPOL Annex I Amendments, 80 Fed. Reg. 5,922, 5,922 (Feb. 4, 2015). Unsurprisingly, section 151.25 closely corresponds to MARPOL Annex I, Regulation 17, which it implements. Both begin with the basic requirement to have an Oil Record Book and related practicalities. *Compare* Reg. 17, para. 1, *with* § 151.25(a)–(c). Both then specify what must be entered in the Oil Record Book, and in what manner. *Compare* Reg. 17, paras. 2–5, *with* § 151.25(d)–(h). Finally, both set out requirements relating to inspection of the Oil Record Book. *Compare* Reg. 17, paras. 6–7, *with* § 151.25(i)–(k). Given this close correspondence, Congress's statutory directive, and the Coast Guard's stated intentions, the government's interpretation takes entirely the wrong tack.

1

In addition to following the structure of Regulation 17, section 151.25 often directly adopts its language. Consider the provisions that serve to require substantive accuracy. Paragraph 2 of Regulation 17 states:

> The Oil Record Book Part I shall be completed on each occasion, on a tank-to-tank basis if appropriate, whenever any of the following machinery space operations takes place in the ship:
>
> .1 ballasting or cleaning of oil fuel tanks;
>
> .2 discharge of dirty ballast or cleaning water from oil fuel tanks;
>
> .3 collection and disposal of oil residues (sludge and other oil residues);

.4 discharge overboard or disposal otherwise of bilge water which has accumulated in machinery spaces; and

.5 bunkering of fuel or bulk lubricating oil.

Paragraph 5 additionally states that "[a]ny failure of the oil filtering equipment shall be recorded in the Oil Record Book Part I." Section 151.25(d) implements these provisions of Regulation 17 jot-for-jot:

Entries shall be made in the Oil Record Book on each occasion, on a tank to tank basis if appropriate, whenever any of the following machinery space operations take place on any ship to which this section applies—

(1) Ballasting or cleaning of fuel oil tanks;

(2) Discharge of ballast containing an oily mixture or cleaning water from fuel oil tanks;

(3) Disposal of oil residue;

(4) Discharge overboard or disposal otherwise of bilge water that has accumulated in machinery spaces;

(5) Bunkering of fuel or bulk lubricating oil; and

(6) Any failure, and the reasons for, of the oil filtering equipment.

33 C.F.R. § 151.25(d); *see also id.* § 151.25(e), (f) (enumerating requirements applicable to oil tankers and drilling rigs). Following the enumeration of occasions on

which an entry must be made, each regulation then states that "a statement shall be made in the Oil Record Book of the circumstances of, and the reasons for" an emergency, accidental, or otherwise exceptional discharge.    *Id.* § 151.25(g); *accord* Reg. 17, para. 3.

Most pertinent here, both MARPOL and section 151.25 require that entries in the Oil Record Book be "fully recorded without delay."  Again, section 151.25 adopts the language of Regulation 17 nearly (though not quite) word-for-word:

> Each operation described in [the relevant preceding paragraphs] shall be fully recorded without delay in the Oil Record Book [Part I,] so that all the entries in the book appropriate to that operation are completed.  Each completed operation shall be signed by the [person/officer] or [persons/officers] in charge of the operations concerned and each completed page shall be signed by the master or other person having charge of the ship.

33 C.F.R. § 151.25(h); *accord* Reg. 17, para. 4.

### 2

The provisions of section 151.25 that concern "maintenance" correspond to Regulation 17 in a similar manner, implementing its substantive requirements with only minor linguistic or structural variations.  Regulation 17 begins with the basic requirement to have an Oil Record Book:

> Every [covered vessel] shall be provided with an Oil Record Book Part I (Machinery space operations).  The Oil Record Book, whether

as a part of the ship's official log-book or otherwise, shall be in the form specified in appendix III to this Annex.

Reg. 17, para. 1. Section 151.25 similarly begins:

Each [covered vessel] shall maintain an Oil Record Book Part I (Machinery Space Operations). [Certain vessels] shall also maintain an Oil Record Book Part II (Cargo/Ballast Operations).

33 C.F.R. § 151.25(a). It then states that "[a]n Oil Record Book printed by the U.S. Government is available to the masters or operators of all [covered U.S. ships] from" certain Coast Guard offices and that "[t]he ownership of the Oil Record Book of all U.S. ships remains with the U.S. Government," *id.* § 151.25(b)–(c). Together, these paragraphs fulfil MARPOL's requirement that an Oil Record Book "shall be provided" to (and will thereafter be possessed by) ships subject to MARPOL.

The provisions relating to inspection of the Oil Record Book continue this pattern. Paragraph 6 of Regulation 17 states:

The Oil Record Book Part I, shall be kept in such a place as to be readily available for inspection at all reasonable times and, except in the case of unmanned ships under tow, shall be kept on board the ship. It shall be preserved for a period of three years after the last entry has been made.

In turn, section 151.25 states:

> (i) The Oil Record Book shall be kept in such a place as to be readily available for inspection at all reasonable times and shall be kept on board the ship.

> (j) The master or other person having charge of a ship required to keep an Oil Record Book shall be responsible for the maintenance of such record.

> (k) The Oil Record Book for a U.S. ship shall be maintained on board for not less than three years.

"[O]ur task is to interpret the regulation as a whole, in light of the overall statutory and regulatory scheme." *Safari Club Int'l*, 31 F.4th at 1171 (citation omitted). To that end, Regulation 17 serves as an "aid in the proper construction of" section 151.25, *Hopson*, 622 F.2d at 1380,[3] and unless there is good reason to think otherwise, we should expect that the provisions of section 151.25 enact the substance of the treaty provision to which they correspond. Particularly where the ordinary meaning of a regulatory term matches the substance of the requirement it implements, there is little reason to chart a course in another direction.

---

[3] My colleagues argue that *Hopson* asks us to determine "the intended meaning of the terms of the statute." 622 F.2d at 1380. But where the agency recently updated its regulations "to harmonize [them] with international conventions," MARPOL Annex I Amendments, 80 Fed. Reg. 5,922, 5,922 (Feb. 4, 2015), some attention to MARPOL's closely corresponding language with the regulations at issue is meaningful.

Here, MARPOL's substantive requirements give every indication that section 151.25 uses "maintain" in the ordinary sense of "keep in good condition." Paragraph 1 of Regulation 17 does not concern the record book's substantive accuracy—nor even its substantive content. Instead, Regulation 17 begins with basic practical considerations of form and possession. Section 151.25 does the same. Nothing in section 151.25(a)–(c) hints that "shall maintain" establishes an accuracy requirement; on the contrary, because a U.S. ship need not procure its own Oil Record Book, and because its Oil Record Book is owned by the U.S. government, the requirement that a ship "maintain" the government's Oil Record Book is more naturally read as a general caretaking responsibility.

MARPOL's provisions concerning inspection shore up this interpretation. Regulation 17 specifies where an Oil Record Book shall be "kept" and "preserved," and we would usually anticipate that regulations implementing those requirements will have the same effect—particularly when they use words whose ordinary meaning is synonymous with those used in the treaty. *See* Maj. Op. at 18 (defining "maintain" as, in one sense, "preserve from failure or decline" (citation omitted)).

The majority opinion twists itself in knots to avoid this. It understands MARPOL's requirement that Oil Record Books "be preserved for a period of three years after the last entry has been made," Reg. 17, para. 6, in the obvious way—that is, to "requir[e] ships to keep an archived version of their filled-out books on board." Maj. Op. at 29-30. Yet it concludes that when section 151.25(k) requires that an Oil Record Book "shall be maintained on board for not less than three years," it means that a ship must have "an *active* Oil Record Book, with three years' worth of entries." Maj. Op.

at 30. The opinion does not offer any explanation for this, and there is no sensible one. Must a newly chartered ship obtain an Oil Record Book from the Coast Guard, pursuant to section 151.25(a), and immediately stand in violation of the supposed requirement to have three years' worth of entries inside it? Or, may the ship fill the Oil Record Book over the course of three years, then start a new volume and discard the old? Presumably so, as the opinion specifically disclaims an interpretation of section 151.25(k) whereby ships are "require[d] to keep old volumes of their Oil Record Book aboard for three years from the date of their last entry." Maj. Op. at 30. But if we are to understand that "the ability of port states to refer violations to flag states hinges on the reliability of foreign ships' Oil Record Books," Maj. Op. at 32 (citation omitted), we must consider whether enforcement of MARPOL will be made any easier when a ship dumping oily bilge water may also toss its Oil Record Book overboard so long as there are three years' worth of entries within.[4]

Reading "maintain" to mean "keep for inspection" leaves no loose end with which to become so entangled. Such a reading harmonizes the general possessory

---

[4] My colleagues' reference to section 1905, Maj. Op. at 27 n.10, is unpersuasive, as the word "maintain" in section 1905(d)(1) does not do the work that my colleagues need it to do: generate a substantive accuracy requirement. That substantive accuracy command in section 1905(d)(1) is when the statute specifies that the list is one "with respect to which a certificate issued under this section—(A) is in effect; or (B) has been revoked or suspended." 33 U.S.C. § 1905(d)(1)(A)-(B). If the list does not contain those ports, then the list is substantively inaccurate. But that accuracy requirement does not inexorably flow from the mere use of the word "maintain" in the statute. Section 151.25 is distinct: the paragraphs therein that use "maintain" and "maintenance" do not contain within themselves a substantive accuracy requirement, as they must for my colleagues' analogy to section 1905 to bear weight.

requirement of section 151.25(a) with the specific inspection-related requirements in paragraphs (i) through (k), and it aligns with both ordinary meaning and the MARPOL provisions the regulation implements.

## III

I know that my conclusion disagrees with the Second Circuit's pronouncement that "[n]o reasonable reader of [section 151.25] could conclude . . . that the regulation merely imposes an obligation to preserve the [Oil Record Book] in its existing state." *United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 309 (2d Cir. 2009) (per curiam). I do not lightly depart from the conclusion our sister circuits have drawn. *See id.*; *United States v. Jho*, 534 F.3d 398 (5th Cir. 2008); *United States v. Vastardis*, 19 F.4th 573 (3d Cir. 2021); *Hornof v. United States*, 107 F.4th 46 (1st Cir. 2024).[5] However, our precedent requires that we interpret the text of a regulation in light of the overall regulatory scheme, exhausting textual and structural clues, and when doing so leads to a conclusion contrary to that drawn by other courts, we must not be afraid to swim against the tide.

Our sister circuits' analyses primarily concerned "the purpose of MARPOL and . . . APPS," *Ionia*, 555 F.3d at 309, and because purpose is another of our interpretive tools, *see Amazon.com, Inc.*, 934 F.3d at 984, it merits our attention as

---

[5] Prior to any these, the Third Circuit had "[a]ssum[ed] that the proper scope" of a defendant's violation of section 151.25 was "the knowing 'failure to maintain an accurate oil record book within U.S. waters,'" which was necessary for sentencing purposes. *United States v. Abrogar*, 459 F.3d 430, 435 (3d Cir. 2006). *Abrogar* did not reach the merits of whether failure to comply with recordkeeping requirements becomes a domestic offense if not retroactively corrected prior to entering the United States.

well. Congress adopted APPS with the aim of protecting the environment by enabling sanctions for the discharge of oily bilge water; I agree that "[a]t its core, MARPOL seeks to prevent oceanic pollution." Maj. Op. at 31-32. It is also easy to imagine that prosecuting those who have violated MARPOL while in international waters would "further[] the objectives prescribed" by MARPOL and APPS. *Hornof*, 107 F.4th at 59. However, as the Supreme Court has reminded us, "it is quite mistaken to assume . . . that 'whatever' might appear to 'further[] the statute's primary objective must be the law.'" *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) (brackets in original) (quoting *Rodriguez v. United States,* 480 U.S. 522, 526 (1987) (per curiam)); *see also Goffney v. Becerra*, 995 F.3d 737, 744 (9th Cir. 2021) (quoting *Henson* in the regulatory context). Here, there are several reasons to think that APPS and related regulations were adopted for the purpose of enacting MARPOL's violation-referral system, rather than the purpose of pursuing enforcement "at all costs." *Henson*, 582 U.S. at 89 (citation omitted).

1

First, we cannot presume a regulation's purpose is contrary to that of the legislation authorizing it. *Cf. Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024) ("[W]hen a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it."). Here, although Congress's authorization of "any necessary or desired regulations to carry out the provisions of the MARPOL Protocol" and APPS offers much latitude, 33 U.S.C. § 1903(c)(1), its specific mandates in certain areas offer meaningful constraints.

One such area concerns enforcement.  Congress directed
the Secretary of Homeland Security to "cooperate with other
parties to the MARPOL Protocol . . . in the detection of
violations and in enforcement of the MARPOL Protocol."
*Id.* § 1907(a).    As a general matter, following an
investigation, the Secretary may "take the action required by
the MARPOL Protocol . . . and whatever further action he
considers  appropriate  under  the  circumstances."    *Id.*
§ 1907(b).  Regarding MARPOL Annex I, however, more
specific provisions apply.  Namely, in the event that "an
inspection . . . indicates that a violation [of MARPOL Annex
I] has occurred, the investigating officer shall forward a
report to the Secretary [of Homeland Security] for
appropriate action"; in turn, the Secretary "shall undertake
to notify the master of the ship concerned and, acting in
coordination with the Secretary of State, shall take any
additional action required by Article 6 of [MARPOL]."  *Id.*
§ 1907(c) (flush language).  The enforcement scheme set out
in Article 6 requires that "a report . . . be forwarded" to "the
Government of the State under whose authority the ship is
operating" "for any appropriate action." [6]   MARPOL arts.
6(2) & 2(5), 1340 U.N.T.S. at 187, 185.  By its own terms,
therefore, APPS carries out MARPOL's violation-referral
approach.

---

[6] Even if APPS were murky, we must be cautious not to "erroneously
adopt an interpretation of U.S. law that carries foreign policy
consequences not clearly intended by the political branches."  *Kiobel v.
Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013).  We should be
especially mindful here, where Congress's mandate that enforcement
referrals be undertaken in consultation with the Secretary of State
indicates such consequences may lurk below the surface. *See* 33 U.S.C.
§ 1907(c) (flush language).

*Ionia* concluded that "[i]f ships . . . did not have to maintain an accurate [Oil Record Book], member states would be severely hampered in their ability to report violations [of MARPOL] to the flag state for enforcement, and the international system of reporting and accountability under MARPOL would collapse." 555 F.3d at 308. But ships do have to maintain accurate Oil Record Books, as they must "fully record[]" events "without delay." MARPOL Annex I, Reg. 17, para. 4; *accord* 33 C.F.R. § 151.25(h). When they fail to do so while in international waters, both MARPOL and APPS anticipate that the violation will be referred to the ship's flag state, *see* MARPOL art. 6(2); 33 U.S.C. § 1907(c), and one presumes that is why the government did not charge Korotkiy with actual recordkeeping failures. Far from risking systemic collapse, this decision not to prosecute extraterritorial conduct does exactly what the "international system of reporting and accountability under MARPOL" requires.

We cannot presume that the regulations authorized by APPS have a purpose contrary to it. Because APPS implements MARPOL, rather than pursuing prosecution of pollution "at all costs," *Henson*, 582 U.S. at 89 (citation omitted), its purpose supports an interpretation of "maintain" that steers clear of prosecuting uncorrected high-seas recordkeeping failures.

## 2

As a practical matter, nothing about the Coast Guard's investigatory authority turns on whether an Oil Record Book is accurate. Rather, the Coast Guard may investigate any ship "to which the MARPOL Protocol . . . applies" while it is "at a port or terminal subject to the jurisdiction of the United States." 33 U.S.C. § 1907(c)(2)(A). In order "to

verify whether or not the ship has discharged a harmful substance in violation of the MARPOL Protocol," *id.*, the Coast Guard may examine the ship and its "oil content meter continuous records," and may thereby discern a discrepancy with Oil Record Book entries.  33 C.F.R. § 151.23.

Consonantly, none of the cases resolved by the circuit courts in favor of domestic prosecution—neither this one, nor *Jho*, *Ionia*, *Vastardis*, *Abrogar*, or *Hornof*—came to be investigated because of a recordkeeping discrepancy. Rather, in most, a crew member with knowledge that illegal discharges had taken place in international waters alerted United States authorities to that fact,[7] while in *Vastardis*, further investigation was prompted by implausibly low readings from the ship's oil content meter.  19 F.4th at 578. The ships' Oil Record Books played a role in the subsequent investigations, but even at that stage, their accuracy was not dispositive.  In *Vastardis*, for example, the Oil Record Book entries matched the data stored on the memory chip of the ship's oil content meter, because it had been physically bypassed while discharges were made, *id.* at 579, while in

---

[7] Here, the *Donald*'s Second Engineer contacted the Coast Guard "in advance of a routine scheduled Port State Control examination." Likewise, the ship in *Jho* was investigated on the basis of "a tip from another engineer," 534 F.3d at 400; in *Ionia*, "the Coast Guard received a report from the . . . electrician" of the ship, Br. for the United States at 10, *Ionia*, 555 F.3d 303 (No. 07-5801); and in *Hornof*, a crew member elevated his concerns to a superintendent for the company that owned and operated the ship, which "informed United States officials of the alleged wrongdoing," 107 F.4th at 52–53.  In *Abrogar*, though the Coast Guard was not tipped off ahead of time, inspectors "conducting a Port State control inspection . . . . learned through various crew members that the [ship] had routinely discharged oil sludge and oil-contaminated bilge water directly overboard."  Br. of Appellee at 7, *Abrogar*, 495 F.3d 430 (No. 06-1215).

*Ionia*, the "crew made false entries in the [Oil Record Book] to conceal [unlawful] discharges," 555 F.3d at 305. Nonetheless, in each of these cases, the government had the requisite evidence to enforce MARPOL and APPS.

The examples offered by these cases make it doubtful that "'a foreign-flagged vessel could avoid application of the record book requirements simply by falsifying all of its record book information just before entry into a port or navigable waters,' and thus avoid detection." *Ionia*, 555 F.3d at 308 (quoting *Jho*, 534 F.3d at 403). My colleagues raise the further specter of a ship presenting "an inaccurate, fraudulent, and incomplete Oil Record Book," Maj. Op. at 33, but in fact, such a book would be proof positive that a ship had failed to keep the records required by MARPOL. Far from being "useless in the effort to halt oceanic pollution or deter repeat infringers," Maj. Op. at 33, such a record book would be obvious and immediate grounds for referral to a vessel's flag state—just as would occur if an Oil Record Book documented every instance of a ship's unlawful extraterritorial dumping, rather than none. Thus, even acknowledging that enforcement of MARPOL would be simplified if crew members always recorded unlawful discharges in their ship's Oil Record Book, I cannot go so far as to say that "the Coast Guard's ability to conduct investigations against foreign-flagged vessels would be severely hindered" by interpreting section 151.25 in a manner that requires recordkeeping violations to be referred to a vessel's flag state. *Jho*, 534 F.3d at 403. Investigations mainly turn on inconsistencies in the available evidence, not on an accurate confessional record. I trust that in carrying out its inspections, the Coast Guard is not routinely bamboozled by record books that it knows may be dubious

but which it fails to verify against physical evidence, other records, and the statements of the crew.[8]

### 3

Precisely because a ship's failure to *have* and *preserve* its Oil Record Book would deny investigators a means of identifying inconsistencies, the purpose of enforcing MARPOL is well-served by a requirement to maintain the Oil Record Book in its existing state. Preservation for later review is the typical purpose of a logbook, of course, and the notion that a log must be preserved in its existing state regardless of accuracy is longstanding: the better part of a century ago, our court recognized that "[t]he alteration of logbooks by erasure and substitution . . . ha[d] long been condemned in courts of admiralty" and "creates a strong presumption that the erased matter was adverse to [the

---

[8] Though my colleagues find it "unclear" how the Coast Guard may identify discrepancies with "oil content meter continuous records" under section 151.23(c) without reference to a substantively accurate Oil Record Book, Maj. Op. at 33 n.14, the Coast Guard may demand substantive accuracy under that regulation by insisting that an "inspection under this section may include an examination of the Oil Record Book . . . ," and a "copy of any entry in the Oil Record Book may be made and the Master of the ship may be required to certify that the copy is a true copy of such entry." 33 C.F.R. § 151.23(c). The first clause requires production of an Oil Record Book in good condition, while the second clause allows for formal certification. Here is yet another indicator that substantive accuracy requirements are not announced with the bare mention of the word "maintain," but through mechanisms such as formal certification.

vessel's] contention." *The Silver Palm*, 94 F.2d 754, 763 (9th Cir. 1937).[9]

Features of section 151.25 indicate that Oil Record Books are expected to serve the same ends as any other logbook. Reading the requirement that an Oil Record Book be "maintained on board for not less than three years" alongside the requirement that it "be kept in such a place as to be readily available for inspection at all reasonable times," 33 C.F.R. § 151.25(k), (i)—requirements which Regulation 17 of MARPOL Annex I states together in a single paragraph, using "preserve" in place of "maintain"— evidences a purpose of permitting inspection, and thus permitting detection of inaccuracies or post-hoc revisions. The requirements that operations be "fully recorded without delay," that "each completed operation . . . be signed by the person or persons in charge of [it]," and that "each completed page" of an Oil Record Book "be signed by the master or other person having charge of the ship," 33 C.F.R. § 151.25(h), aim to regularly crystallize recent events while permitting the later identification of individuals who may verify or be accountable for them. They also serve to ensure that an Oil Record Book will be substantively accurate, but we have no basis for assuming that the aims of contemporaneity and permanence are subordinated to that end.

---

[9] A regulatory scheme could require that entries be appended to a record to correct or supplement it, and indeed, this is what federal law requires of domestic ships' official logbooks. *See* 46 U.S.C. § 11302 (requiring that entries be "made as soon as possible after the occurrence," but that those "not made on the day of the occurrence . . . be dated and state the date of the occurrence"). Even under such a scheme, however, the obligation to correct inaccuracies does not inhere in the duty to maintain the book itself.

IV

None of our navigational aids lead to the interpretation of "maintain" that my colleagues and our sister circuits have adopted. Thus we must chart our own course, because ordinary meaning, usage in related provisions, the language of MARPOL, and the MARPOL-focused purpose of APPS all support interpreting "maintain" in the sense of "preserve." That is how we must interpret the term. Whatever other wrongs Korotkiy committed, he did not fail to maintain the *Donald*'s Oil Record Book or cause such a failure while in United States waters. His conviction for that charge cannot stand.